UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------- ---------------------------------X
                                              |
GRAND INCOME TAX, INC., and                   |
SUNCOAST FINANCIAL SOLUTIONS,                 |
INC.,                                         |
                                              |  NOT FOR PUBLICATION
            Plaintiffs,                       |  MEMORANDUM & ORDER
                                              |
      -against-                               |
                                              |
HSBC TAXPAYER FINANCIAL                       |  08-CV-346 (CBA)
SERVICES, INC., and HSBC BANK                 |
USA, N.A.,                                    |
                                              |
            Defendants.                       |
                                              |
--------------------------------------------------X

AMON, United States District Judge

Plaintiffs Grand Income Tax, Inc. ("Grand") and Suncoast Financial Solutions, Inc. ("Suncoast") are franchisees operating tax preparation businesses under franchise agreements with Jackson Hewitt, Inc. ("Jackson Hewitt"). They sue defendants HSBC Taxpayer Financial Services, Inc. ("HSBC TFS") and HSBC Bank USA, N.A. ("HSBC Bank") on behalf of a putative class of similarly situated Jackson Hewitt franchisees. Plaintiffs allege that they are required under their Franchise Agreements with Jackson Hewitt to enter into contracts with defendants to offer their customers Refund Anticipated Loans ("RALs"), by which customers are advanced the amount of their anticipated tax refunds minus loan fees and repay the loans when they receive their refunds. Previously, plaintiffs were entitled under their one-year contracts with defendants to charge their customers application fees for these transactions. In 2007, however, HSBC TFS changed the agreement and plaintiffs are now prohibited from charging application fees. Plaintiffs assert that this change makes their contracts with defendants

-1-

unenforceable. They seek declaratory relief that the contracts are void for lack of consideration, economic duress, lack of consent, undue influence, and unconscionability. They also seek an injunction preventing defendants from enforcing the contracts, recovery for unjust enrichment, rescission of the current contract, and restitution for the value of their services by which defendants received a monetary benefit. Defendants have moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) or for failure to join Jackson Hewitt as an indispensable party pursuant to Fed. R. Civ. P. 12(b)(7). In the alternative, defendants seek to strike the class action allegations under Fed. R. Civ. P. 12(b)(6). For the following reasons, the Court grants defendants' motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

A RAL is a loan made based on a customer's anticipated federal income tax refund. According to the allegations in the complaint, the lender gives the customer a check in advance for the amount of his or her anticipated tax refund, minus loan fees, in return for the customer's agreement to give the tax refund to the lender when it is received. Compl. ¶ 11. Because they are tied to the customer's tax refund, these loans are usually offered in conjunction with tax preparation services, and lenders find it difficult to make such loans without the assistance of a tax preparation company. Id. ¶¶ 11-12. RALs tend to be a lucrative source of business for lenders like HSBC TFS and carry a low risk of default because they are tied to tax refunds. Id. ¶¶ 13-14.

Jackson Hewitt is the second largest tax preparation service in the United States, with 6,500 offices nationwide, most of which are owned and operated by independent franchisees. Id.

¶ 15. Jackson Hewitt provides each franchisee with a Uniform Franchise Offering Circular ("UFOC"), which includes a form Franchise Agreement. See id. ¶ 16, Ex. A. As part of their agreement with Jackson Hewitt, franchisees agree that if Jackson Hewitt decides to offer "Bank Products" such as RALs, the franchisee must offer those products. Id. ¶ 17. Specifically, the standard Franchise Agreement requires that (a) if Jackson Hewitt decides to offer Bank Products, franchisees must offer such Bank Products to their customers; (b) franchisees must use the lender selected by Jackson Hewitt as the source of their Bank Products; and (c) franchisees must enter into contracts with the lender in order to do so. Id. ¶ 21; see also id. Ex. A at 16-17. Plaintiffs are also subject to covenants not to compete, which would preclude them from preparing tax returns within 10 miles of their franchised territories for two years after termination of their franchise. Id. ¶ 21.

Pursuant to their obligations under the Franchise Agreement, plaintiffs entered into contracts with HSBC TFS ("Bank Product Agreements" or "BPAs") in 2005, 2006, and 2007 for Bank Products offered in 2006, 2007, and 2008. Id. ¶ 23, Exs. D, E. Under these agreements, HSBC TFS acts as the loan administrator for RALs and other Bank Products and HSBC Bank acts as the loan originator. Id. ¶ 23. The BPAs are standard form contracts used by HSBC TFS with all Jackson Hewitt franchisees operating in the United States for which Jackson Hewitt has designated defendants as the lender. Id. ¶ 24.

Under the BPAs, defendants agree to offer Bank Products to plaintiffs' customers and plaintiffs agree to be subject to the terms of defendants' Bank Products Program. See Compl. Ex. D at ¶ 1.1, Ex. E at ¶ 1.1. As part of this arrangement, the plaintiffs agree to perform certain

services in connection with the Bank Products.[1]  Compl. ¶ 25.  For example, plaintiffs must input material information for each application, review each income document to ensure it has been issued by a valid entity, notify defendants if anyone attempts to obtain a Bank Product by fraud, and deliver copies of the loan application to customers, among several other similar duties.  Id. ¶ 25; see also, e.g., Compl. Ex. D at ¶¶ 1.4-1.10.  Once defendants receive an application, defendants deliver the customer's tax preparation fees to the franchisee by withholding the fees from the Bank Product and crediting them to the franchisee's designated bank account.  See, e.g. Compl. Ex. D at ¶ 2.3.

Prior to 2006, the BPAs allowed franchisees to charge application or other fees to customers in connection with the sale of Bank Products, subject to HSBC TFS approval.  Compl. ¶¶ 28-29.  For example, the 2005-2006 BPA signed by Suncoast provides: "HSBC TFS understands and agrees that FRANCHISEE may charge application or other fees in connection with the sale of Bank Products to customers in amounts determined by FRANCHISEE and approved by HSBC TFS, which approval shall not be unreasonably withheld, but such fees shall not exceed forty dollars ($40)."  Id. ¶ 29. Ex. E at ¶ 5.1.  Prior to 2006, in accordance with this provision, plaintiffs Grand and Suncoast charged a fee for each application.  Id. ¶ 34.  For the 2006-2007 contract, however HSBC TFS changed the agreement, and the 2006-2007 and 2007-2008 BPAs prohibit franchisees from charging application fees.  Id. ¶¶ 30-31.  Defendants do not otherwise pay plaintiffs compensation in connection with this program.  Id. ¶¶ 32-33, Ex. D at ¶ 5.1.

---

[1] According to plaintiffs, these services "for all intents and purposes, amount to loan origination duties" undertaken for the benefit of defendants.  Compl. ¶ 25.

Plaintiffs claim that, "[a]s a result of HSBC TFS's unilateral modifications to the Bank Product Agreement, plaintiffs are required to perform services for Defendant's benefit, but are precluded from receiving any compensation for those services." Compl. ¶ 35. Under plaintiffs' Franchise Agreement with Jackson Hewitt, however, plaintiffs are required to enter into BPAs despite this restriction on their ability to be compensated. Id. Defendants are aware that plaintiffs' failure to sign the BPA could be considered a breach of the Franchise Agreement, which could result in the termination of plaintiffs' business. Id. ¶ 42. HSBC enters into similar agreements with other tax preparation service providers, including independent providers not affiliated with a franchisor, and does not prohibit such providers from charging application fees. Id. ¶ 36.

Plaintiffs argue that defendants have taken advantage of plaintiffs' Franchise Agreement with Jackson Hewitt to force plaintiffs to sign a contract under which they receive no compensation for their services. They raise four causes of action. First, asserting that "the 2007 and 2008 Bank Product Agreements signed by plaintiffs are void and unenforceable due to economic duress, lack of consent, undue influence, unconscionability and lack of consideration," plaintiffs seek a declaratory judgment that "the provisions of the Bank Product Agreements applicable to 2007 and 2008 that prohibit the charging of fees are void and unenforceable." Id. ¶¶ 74-75. Second, plaintiffs seek to enjoin HSBC TFS from enforcing the 2008 BPA. Id. ¶ 83. Third, plaintiffs seek to recover against defendants for unjust enrichment. Id. ¶ 91. Finally, plaintiffs seek to rescind the 2008 BPA. Id. ¶¶ 93-99.

Defendants move to dismiss this action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) or for failure to join Jackson Hewitt as an indispensable party under Fed. R. Civ.

P. 12(b)(7). In the alternative, they seek to strike the class action allegations under Fed. R. Civ. P. 12(b)(6).

## DISCUSSION

**I.     Standard of Review**

Pursuant to Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed "for failure of the pleading to state a claim upon which relief can be granted." A complaint requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see also Erickson v. Pardus, 127 S.Ct. 2197, 2200 (2007). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 127 S.Ct. at 2200 (citing Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965-66 (2007)). The Second Circuit has observed that the standard articulated by the Supreme Court in Twombly remains somewhat uncertain but notes that, "at a bare minimum, the operative standard requires the plaintiff [to] provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." Goldstein v. Pataki, 516 F.3d 50, 56 (2d Cir. 2008) (internal quotation marks and citations omitted).

When determining the sufficiency of a complaint for Rule 12(b)(6) purposes, "consideration is limited to the factual allegations in plaintiffs' [ ] complaint, which are accepted as true, to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (citations omitted); see also I. Meyer Pincus & Assocs.,

P.C. v. Oppenheimer & Co., 936 F.2d 759, 762 (2d Cir.1991) (holding that district courts may consider documents submitted by a defendant on a motion to dismiss if the documents are explicitly relied upon in and integral to the plaintiff's complaint). The Court will draw all reasonable inferences in the plaintiff's favor. Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

## II.     Analysis

The fundamental issue in this case is the validity of the Bank Product Agreements. Plaintiffs claim that the BPAs are invalid due to lack of consideration, duress, undue influence, and unconscionability. They seek various forms of relief. Defendants argue that plaintiffs' allegations fail to support a claim that the BPAs are invalid for any of those reasons, such that plaintiffs are not entitled to any of the relief they seek. The Court therefore turns now to an analysis of the contracts between the parties.

### A.     Applicable Law

The BPAs contain choice of law provisions specifying that they are governed by Delaware law. See, e.g., Compl. Ex. D at ¶ 5.10. The parties agree that Delaware law governs the issues raised on this motion. Accordingly, the Court applies Delaware law to the analysis of plaintiffs' contract defenses and their claim of unjust enrichment. See Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000); OTA Ltd. P'ship v. Forcenergy, Inc., 237 F.Supp.2d 558, 561-62 (E.D.Pa. 2002); Hale v. First USA Bank, N.A., No. 00 Civ. 5406, 2001 WL 687371, at *5 (S.D.N.Y. June 19, 2001).

**B.     Consideration**

Defendants' remaining arguments turn at least in part on the question of what benefit, if any, plaintiffs receive under the BPAs absent the ability to charge their customers application fees. It is helpful for the analysis, therefore, for the Court to consider first whether the BPAs are supported by valid consideration.

"A valid contract 'requires good or valuable consideration.'" Frazier v. American Airlines, Inc., 434 F.Supp.2d 279, 291 (D.Del. 2006) (quoting Haft v. Dart Group Corp., 841 F.Supp. 549, 573 (D.Del. 1993)). The claim "that a party has received no consideration is a conclusion of law." Acker v. Transurgical, Inc., No. Civ.A. 201-N, 2004 WL 1230945, at *4 (Del. Ch. Apr. 22, 2004). Under Delaware law, "consideration for a contract can consist of either a benefit to the promiser or a detriment to the promisee." First Mortgage Co. of Pa. v. Fed. Leasing Corp., 456 A.2d 794, 795-96 (Del. 1982). "Where a contract is executory, the promises of each party supply the consideration necessary to support the promises of the other." Mobil Oil Corp. v. Wroten, 303 A.2d 698, 701 (Del. Ch. 1973). As a general matter, in the absence of fraud or unconscionability, "the adequacy of consideration is not a proper subject for judicial scrutiny." Acker, 2004 WL 1230945, at *4 (internal quotation marks omitted). "[E]ven if the consideration exchanged is grossly unequal or of dubious value, the parties to a contract are free to make their bargain." Id. (internal quotation marks omitted). Only where one side's promise "is a mere illusion, that is, where his promise exists in form only but not in substance," is consideration deemed inadequate. Mobil Oil Corp., 303 A.2d at 701.

The contract between the parties creates obligations on both sides. Plaintiffs agree to permit defendants to issue Bank Products to their customers. They also agree to undertake a

number of responsibilities involved in processing the customers' applications. See Compl. Ex. D at ¶¶ 1.4-1.9. These obligations are all to the benefit of HSBC TFS, which desires to issue these loans. Defendants, for their part, agree to offer Bank Products to plaintiffs' customers. They also agree to process applications in a timely manner in accordance with industry standards. Id. Ex. D at ¶ 2.2. Finally, defendants provide the mechanism by which plaintiffs receive payment for preparing their customers' tax returns. When HSBC TFS receives the customer's application, it deducts plaintiffs' tax preparation fees from the amount of the loan and pays those fees to plaintiffs "via automated clearing house" to plaintiffs' designated bank account. Id. Ex. D at ¶ 2.3.

Plaintiffs argue that, under this arrangement, "HSBC promised nothing. It conferred no benefit on Plaintiffs and suffered no detriment to itself." Pls.' Mem. in Opp'n at 33. This argument rests on the assumption that the only benefit plaintiffs received from their contract with defendants was the ability to charge their customers loan application fees. That is not the case. Another benefit plaintiffs receive under the BPAs is the ability to offer defendants' Bank Products to their customers, and to have defendants provide the mechanism for plaintiffs to receive payment for their tax preparation services.

Plaintiffs argue that the fact that they received their tax preparation fees out of the loan proceeds does not constitute consideration in exchange for their administrative responsibilities "because Plaintiffs were entitled to the fees anyway, on account of the work they did preparing customers' tax returns," which they claim "cannot possibly be construed as work done on HSBC's behalf." Id. It is true, of course, that the tax preparation fees themselves are paid by the customer, not by defendants, in the form of a deduction from the loan amount. Giving plaintiffs

the ability to offer Bank Products to their customers, however, itself constitutes a promise that defendants make for plaintiffs' benefit.  Indeed, that promise lets plaintiffs offer their customers the opportunity to receive money immediately rather than having to wait for their tax refunds. Creating a mechanism for plaintiffs to receive payment for tax preparation fees out of the loan proceeds as part of that arrangement is also a benefit that defendants' promise confers on plaintiffs.  Precisely how great a value that consideration is to plaintiffs is a question of fact,[2] but courts generally do not inquire into the adequacy of consideration.  See, e.g., Acker, 2004 WL 1230945, at *4; Delcollo Elec., Inc. v. Jack Eckerd Drug Co. of Delaware, Inc., No. 85L-AP-6, 1988 WL 67812, at *3 (Del. Super. Ct. June 28, 1988) ("As a general rule, a court of law will not inquire into the adequacy or inadequacy of the consideration involved in a transaction."). Indeed, under plaintiffs' logic, the loan application fees that are the subject of this lawsuit themselves would not constitute valid consideration because those fees, like the tax preparation fees, are paid by the customer, not by defendants.  There is no question that the BPAs are supported by good or valuable consideration, as that term is understood under Delaware law, even without the ability to charge loan application fees.

With this understanding in mind, the Court now turns to plaintiffs' remaining claims for relief.

---

[2] The Court notes, however, that there is reason to think plaintiffs' ability to offer Bank Products to their customers is of considerable value.  Plaintiffs assert in their opposition brief that "RALs are typically made to low- and moderate-income taxpayers who prefer to get cash immediately rather than wait for their tax refunds," which they use to assert that the business is lucrative for banks like HSBC because it allows them to tap into an otherwise hard-to-reach customer base for loans.  See Plaintiffs' Mem. in Opp. at 5.  Logically, the same argument would hold true for plaintiffs' tax preparation services, which someone of low- to moderate-income might not desire or be able to afford without the ability to receive money up-front.

### C. Economic Duress

To state a claim for duress, a plaintiff must establish three elements: "(1) a 'wrongful' act, (2) which overcomes the will of the aggrieved party, (3) who has no adequate legal remedy to protect himself." Block Fin. Corp. v. Inisoft Corp., No. 03C-04-010, 2006 WL 3240010, at *5 (Del. Super. Ct. Oct. 30, 2006) (citing Cianci v. JEM Enter., Inc., No. Civ.A. 16419-NC, 2000 WL 1234647, at *9 (Del. Ch. Aug. 22, 2000)); see also Leonard v. Univ. of Del., 204 F.Supp.2d 784, 788 (D.Del. 2002) (applying Delaware law). The "wrongful act" is traditionally the use of or threat of physical harm, but it may also include economic duress. Bakerman v. Sidney Frank Importing Co., Inc., No. Civ.A. 1844-N, 2006 WL 3927242, at *15 (Del. Ch. Oct. 10, 2006); Cianci, 2000 WL 1234647, at *9; Hanna Sys., Inc. v. Capano Group, L.P., C.A. No. 7408, 1985 WL 21128, at *3 (Del. Ch. Nov. 29, 1985) ("Whatever the limited application of the [duress] doctrine at common law, it is now widely recognized that there are situations in which economic circumstances may invalidate an otherwise valid contract." (internal quotation marks omitted)); Fowler v. Mumford, 102 A.2d 535, 537 (Del. Super. Ct. 1954). "Economic duress exists where one is deprived of the free exercise of his will through wrongful threats or acts directly against a person's business interest." R.M. Williams Co., Inc. v. Frabizzio, Civ. A. No. 9834, 1990 WL 18399, at *3 n.3 (Del. Ch. Feb. 22, 1990); see also Block Fin. Corp., 2006 WL 3240010, at *5. Although "[t]he threat that produces the compelled act must be wrongful," it need not be against the law. Hanna, 1985 WL 21128, at *3. The test for whether the duress caused the formation of the contract "is a subjective one that focuses on the state of mind of the 'victim' of the duress," and looks to see whether the party made its choice in the absence of free will. Id.; see also Cianci, 2002 WL 1234647, at *9. The lack of free will does not mean the party had no choice

whatsoever, but at minimum the party must have been compelled by a wrongful threat to make "a disproportionate exchange of value to protect his business with no adequate alternative legal remedy." Hanna, 1984 WL 21128, at *3 (citing Willston on Contracts § 1617).

Plaintiffs argue that defendants' insistence on unreasonable contract terms caused their free will to be overcome because refusal to agree to defendants' terms would mean that plaintiffs could not offer Bank Products and risked losing their businesses by breaching the Franchise Agreement. While plaintiffs do allege they faced significant consequences if they failed to agree to defendants' terms, aggressive bargaining or "the threat to exercise a legal or contractual right that the maker of the threat clearly holds," without more, is not generally considered improper, even if economic circumstances place the alleged "victim" in a situation in which the offer is hard to turn down. Block Fin. Corp., 2006 WL 3240010, at *5; see also Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB., No. Civ.A. 97C-09-281-JEB, 2001 WL 946521, at *5 (Del. Super. Ct. Aug. 16, 2001); see also Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co., 769 F.Supp. 671, 738 (D.Del. 1991) ("In every contract negotiation there is an implied threat that the party will not perform unless his terms are accepted. This type of implied threat is a necessary part of the bargaining process."). Defendants' alleged conduct does not rise to the level of bad faith, coercive leveraging of exigent circumstances, or extraction of promises to which there was no legal right that characterizes cases in which economic duress was found. Compare Reiver v. Murdoch & Walsh, P.A., 625 F.Supp. 998, 1014 (D.Del. 1985) (holding that "threats of termination of an at-will employee to obtain a release of already accrued benefits could form the basis of an action predicated on economic duress"); Hanna, 1985 WL 21128, at *3-*4 (finding economic duress where landlord deliberately "dragged his feet" for several

months in granting lease extension he had already promised until the morning lessee planned to close an assignment transaction, at which point he demanded ten percent of sale price in exchange for his consent); with Coca-Cola Bottling Co., 769 F.Supp. at 738-39 (finding that Coca-Cola's refusal to supply plaintiffs with diet Coke unless they agreed to waive damages did not constitute economic duress); Block, 2006 WL 3240010, at *5-*6 (finding that threat to discontinue permitting plaintiff to use defendants' tax preparation software unless it agreed to defendants' contract terms did not constitute duress); Edge of the Woods, 2001 WL 946521, at *5 (holding that threats of loan foreclosure and default did not constitute duress). Accordingly, this Court finds that plaintiffs' allegations fail to sustain a claim for economic duress.

### D. Undue Influence

Plaintiffs' claim of undue influence also fails. A party seeking to void a contract based upon undue influence "must show that he was unfairly persuaded to enter the agreement by a party who dominated him, or that the parties' relationship created a justifiable belief that the influencing person would not act contrary to his interests." Singh v. Batta Envtl. Assoc., Inc., No. Civ.A. 19627, 2003 WL 21309115, at *6 (Del. Ch. May 21, 2003); see also Conner v. Brown, 3 A.2d 64, 71 (Del. 1938). Where, as here, no "fiduciary or confidential relationship exists between the parties," there is no presumption of undue influence. Rudnitsky v. Rudnitsky, No. Civ.A. 17446-NC, 2001 WL 1671149, at *4 (Del. Ch. Dec. 20, 2001). Plaintiffs do not assert that defendants "dominated" them in requiring them to accept their contract terms; instead, they argue that they were unduly influenced by Jackson Hewitt. Even if plaintiffs could invalidate a contract with defendants based upon a third party's influence, plaintiffs' allegations are insufficient for the reasons discussed regarding economic duress. Accordingly, this Court

finds that plaintiffs fail to state a claim for undue influence.

   E.   **<u>Unconscionability</u>**

For a contract to be void for unconscionability, "there must be an absence of meaningful choice and contract terms unreasonably favorable to one of the parties." <u>Tulowitzki v. Atlantic Richfield Co.</u>, 396 A.2d 956, 960 (Del. 1978). The "absence of meaningful choice" is known as "procedural" unconscionability, whereas the "unreasonably favorable" terms is regarded as "substantive" unconscionability. <u>See</u> <u>Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.</u>, No. C.A. 19209, 2002 WL 1558382, at *11 n.46 (Del. Ch. Jul. 9, 2002) (citing <u>Farnsworth on Contracts</u> § 4.28 (2d ed. 2000)). Superior bargaining power is not enough; the plaintiff must prove that "the party with superior bargaining power used it to take unfair advantage of its weaker counterpart." <u>Id.</u> at *11. Under Delaware law, the test for unconscionability is whether the contract is "such as no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other." <u>Tulowitzki</u>, 396 A.2d at 960 (quoting <u>Williams v. Walker-Thomas Furniture Co.</u>, 350 F.2d 445, 450 n.12 (D.C. Cir. 1965)). Courts are reluctant to declare a contract to be unenforceable on the grounds of unconscionability. <u>Progressive</u>, 2002 WL 1558382, at *11.

For the reasons discussed with regard to plaintiffs' claim of duress and lack of consideration, this Court cannot find that plaintiffs' allegations support a conclusion that the BPAs are "so one-sided as to be oppressive." <u>Tulowitzki</u>, 396 A.2d at 960. Notably, plaintiffs do not cite a single case in support of their unconscionability argument. Accordingly, this Court finds that plaintiffs fail to state a claim that the BPAs are void for unconscionability.

### F. Unjust Enrichment

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Schlock v. Nash, 732 A.2d 217, 232 (Del. 1999) (internal quotation marks omitted). Under Delaware law, a plaintiff may not maintain a claim for unjust enrichment where there is a contractual relationship between the parties. See Bakerman v. Sidney Frank Importing Co., No. Civ.A. 1844-N, 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006); Albert v. Alex Brown Mgmt. Servs., No. Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005). As discussed above, the contract between the parties is valid and enforceable. Therefore, plaintiffs do not state a claim for unjust enrichment.

### CONCLUSION

For the reasons set forth above, defendants' motion to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) is granted.[3] The Clerk of the Court is directed to enter judgment in accordance with this order and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
November 25, 2008

Carol Bagley Amon
United States District Judge

---

[3] Because this Court concludes that defendants' motion to dismiss for failure to state a claim should be granted, it is unnecessary to consider the remaining motions.